# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39194**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Thomas G. ARNOLD**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 27 June 2018

———————————

*Military Judge:* Gregory O. Friedland (arraignment); Charles R. Wiedie, Jr.; Patricia A. Gruen.

*Approved sentence:* Dishonorable discharge, confinement for 8 years, and reduction to E-1. Sentence adjudged 29 July 2016 by GCM convened at Andersen Air Force Base, Guam.

*For Appellant:* Lieutenant Colonel Nicholas W. McCue, USAF; Major Patricia Encarnación Miranda, USAF; Brian L. Mizer, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Tyler B. Musselman, USAF; Captain Michael T. Bunnell, USAF; Mary Ellen Payne, Esquire.

Before HARDING, SPERANZA, and HUYGEN, *Appellate Military Judges.*

Senior Judge HARDING delivered the opinion of the court, in which Judges SPERANZA and HUYGEN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

HARDING, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of sexual abuse of a child, his 15-year-old stepdaughter, MB, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b, and one specification of obstruction of justice in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1] Specifically, Appellant was found guilty of touching MB's breast with his hand on divers occasions; touching MB's genitalia and breast with his hand and mouth; and wrongfully endeavoring to influence the actions of MB by giving her money, lying to MB's mother (KA) about her whereabouts, and allowing MB to attend sleepovers in order to prevent MB from reporting the sexual abuse to authorities. The members sentenced Appellant to a dishonorable discharge, confinement for eight years, and reduction to the grade of E-1. The convening authority approved the adjudged sentence but waived the mandatory forfeiture of pay and allowances for the benefit of Appellant's dependents.

Appellant raises 11 issues on appeal: (1) whether a dismissal without prejudice was an adequate remedy for an appearance of unlawful command influence; (2) whether the military judge abused her discretion in excluding evidence of MB's motive to fabricate under Military Rule of Evidence (Mil. R. Evid.) 412; (3) whether the charges should be dismissed for outrageous Government conduct and interference with Appellant's Sixth Amendment right to counsel; (4) whether Appellant was denied his Sixth Amendment right to speedy trial; (5) whether the military judge abused her discretion when she declined to conduct an in camera review of MB's mental health records; (6) whether the military judge abused her discretion in admitting a prior statement of MB; (7) whether trial counsel's comment on Appellant's exercise of his constitutional rights was harmless beyond a reasonable doubt; (8) whether Appellant was prejudiced by ineffective assistance of counsel; (9) whether Appellant is entitled to eight months of confinement credit and, if not, whether this court should approve no more than six years of confinement pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866;[2] (10) whether Appellant has been denied his

---

[1] Appellant was acquitted of the following offenses alleged by MB: two specifications of aggravated sexual abuse of a child, in violation of Article 120, UCMJ, 10 U.S.C. § 920, in effect during the period between 1 October 2007 and 27 June 2012; two specifications of sexual abuse of a child in violation of Article 120b, UCMJ; and two specifications of indecent acts with a child in violation of Article 134, UCMJ, in effect during the period between 1 October 2007 and 27 June 2012.

[2] We have considered and reject this claim, which neither requires additional analysis nor warrants relief. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

due process right to timely appellate review; and (11) whether this court's rule regarding the filing of pleadings containing sealed materials interferes with Appellant's statutory and constitutional rights to assistance of counsel and to present his defense on direct appeal.[3] We find no prejudicial error and affirm.

## I. BACKGROUND

Appellant, accompanied by his family, was stationed at Andersen Air Force Base, Guam. In early April 2013, KA overheard her 15-year-old daughter, MB, whispering over the phone about sneaking out of their home in the middle of the night to meet her 19-year-old boyfriend, AB. After informing Appellant of MB's plan, KA and Appellant decided that Appellant would wait outside the home and catch MB in the act. AB arrived and parked his vehicle down the street from Appellant's home. As AB walked to the driveway to meet MB, Appellant emerged from the shadows, made his presence known to both AB and his stepdaughter, and confronted them about MB sneaking out of the house at night. Appellant asked AB to provide him identification and AB complied. Appellant then told them their conduct was not appropriate and informed AB he could call the police due to the age difference between AB and MB. In response, AB told Appellant to do so and that they [MB and AB] would "just tell [the police] how much you touch your daughter."

Appellant's demeanor immediately transformed from stern to docile. Appellant then meekly asked MB what she wanted him to do. MB told Appellant to lie to KA and tell her that AB had taken MB to a female friend's house. Appellant complied and MB departed to spend the night with AB. The next morning, at MB's request, Appellant transferred $200 to MB's account. Appellant then texted MB, "I love you and I don't want to see our family get hurt. I am at your disposal." MB later informed Appellant that she used the $200 to decorate AB's apartment. MB again asked Appellant to lie to KA by telling her that MB was staying at another girlfriend's house the next night. Appellant once again lied to KA about their daughter's whereabouts. Appellant texted MB, "You have to know I had no idea I made you feel that way. I don't want to hurt you. I love you. Can you consider letting me do right by you before you take the next step?"

After two days of placating and covering for MB with KA, Appellant told MB on the third night she could no longer come and go as she pleased. In response, MB woke up KA and told her that she was leaving but would not say why. Instead, MB insisted that Appellant tell KA the reason why MB wanted to leave. Appellant then told KA that MB was accusing him of abusing her.

---

[3] We have considered and reject this claim, which neither requires additional analysis nor warrants relief. *See Matias*, 25 M.J. at 363.

After learning of the allegation, KA let MB leave with AB and called Appellant's first sergeant. A few days later, Appellant was arrested by Guamanian federal authorities. Appellant was held in a federal confinement facility and remained there for eight months until the Guamanian authorities declined to prosecute the case because of MB and KA's refusal to cooperate and released Appellant. Subsequently, the Air Force asserted jurisdiction over the alleged offenses.

## II. DISCUSSION

### A. Appearance of Unlawful Command Influence

Charges were originally preferred on 3 February 2014 and investigated at an Article 32, UCMJ, 10 U.S.C. § 832, hearing on 19 and 20 March 2014. The convening authority making the disposition decision over these preferred charges restricted the Article 32 investigating officer (IO) from determining matters covered by Mil. R. Evid. 412 at the pretrial investigation. The military judge found this restriction on the IO created an appearance of unlawful command influence (UCI). The military judge further stated he was "not convinced beyond a reasonable doubt that the UCI did not affect the pretrial investigation" of the case. As a remedy for the UCI, the military judge dismissed the charges *without* prejudice on 31 July 2014. Months later on 18 November 2014 charges were preferred anew against Appellant. A second Article 32 hearing was held on 6 March 2015.

Between the March 2014 and March 2015 hearings, amendments[4] to Article 32, UCMJ, had taken effect, which transformed the Article 32 from a pretrial investigation into a preliminary hearing, and included the right of a victim to decline to testify at a preliminary hearing.[5] At the March 2014 hearing, MB *did* appear and testify and was subject to substantial cross-examination, although Appellant's counsel was not permitted to ask MB about matters covered by Mil. R. Evid. 412. For the March 2015 hearing, MB exercised her right and declined to testify. Appellant now argues that, because MB exercised that right and Appellant lost the opportunity to cross-examine MB on Mil. R. Evid. 412 matters at the March 2015 preliminary hearing, the military judge's remedy of dismissal proved to be "no remedy at all." On that basis, Appellant urges

---

[4] *See* The National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113–66, sec. 1702, § 832, 127 Stat. 672, 954–58 (2013).

[5] Appellant has not asserted that the application in his case of the procedural rules of a preliminary hearing violated the Ex Post Facto Clause of the United States Constitution. U.S. CONST., Art. 1, § 9.

us to set aside the findings and sentence and dismiss the charges *with* prejudice. We decline to do so.

UCI is "the mortal enemy of military justice." *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004) (quoting *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)). Where it is found to exist, judicial authorities must take those steps necessary to preserve both the actual and apparent fairness of the criminal proceeding. *United States v. Rivers*, 49 M.J. 434, 443 (C.A.A.F. 1998); *United States v. Sullivan*, 26 M.J. 442, 444 (C.M.A. 1988). The "appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial." *United States v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003) (quoting *United States v. Stoneman*, 57 M.J. 35, 42–43 (C.A.A.F. 2002)).

When an appellant asserts appearance of UCI, he initially must show "some evidence" that UCI occurred. *Stoneman*, 57 M.J. at 41 (internal quotation marks and citation omitted). This burden on the defense is low, but the evidence presented must consist of more than "mere allegation or speculation." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013). Once an appellant presents "some evidence" of UCI, the burden then shifts to the Government to rebut the allegation. Specifically, the government bears the burden of proving beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute UCI. *Id.* If the government meets its burden, the appellant's claim of UCI will be deemed to be without merit and no further analysis will be conducted. *See id.*

If the government does not meet its burden of rebutting the allegation at this initial stage, then the government may next seek to prove beyond a reasonable doubt that the appearance of UCI did not place "an intolerable strain" upon the public's perception of the military justice system and that "an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding." *Id.* (quoting *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)). If the government meets its evidentiary burden at this stage of the analysis, then the appellant merits no relief on the grounds that there was an appearance of UCI. *See, e.g., United States v. Villareal*, 52 M.J. 27, 30–31 (C.A.A.F. 1999) (affirming the decision of the court below after finding that any appearance of UCI was cured by the military judge's actions at court-martial). If the government does not meet its evidentiary burden, however, courts, trial and appellate, will fashion an appropriate remedy. *Lewis*, 63 M.J. at 416.

Because the conclusion of the military judge that there was an appearance of UCI is the law of the case,[6] we need neither determine whether Appellant presented "some evidence" of UCI nor review whether the Government has demonstrated beyond a reasonable doubt that there was no UCI. We are concerned only with whether the Government has met its burden of demonstrating, beyond a reasonable doubt, that these proceedings were untainted by the appearance of UCI. We review this question de novo. *See United States v. Kreutzer*, 61 M.J. 293, 299 (C.A.A.F. 2005) (de novo review of whether constitutional error is harmless beyond a reasonable doubt); *Villareal*, 52 M.J. at 30 (de novo review of issues of UCI). Our review must consider whether the appearance of UCI was eradicated by the military judge's remedy of dismissal without prejudice. We are convinced beyond a reasonable doubt that it was.

The same military judge who concluded there was an appearance of UCI at the March 2014 pretrial investigation and dismissed the original charges without prejudice also decided Appellant's motion to dismiss with prejudice the charges reviewed in the March 2015 hearing. Thus, the military judge had the opportunity to assess whether the remedy he chose did in fact remove the appearance of UCI stemming from the pretrial investigation. The military judge made detailed findings of fact that we now adopt as our own. Importantly, he noted that a different convening authority appointed a different officer to conduct the March 2015 hearing. Further, the new convening authority did not place restrictions on the preliminary hearing officer to decide Mil. R. Evid. 412 issues.

The military judge concluded that the apparent UCI he had previously found was "extinguished with the dismissal of those charges" and "that apparent UCI did not survive into the new preferred charges." We agree. In this case, the "intolerable strain" that had been placed upon the public's perception of the military justice system was the specter of a convening authority restricting the scope of information considered by the IO regardless of its potential materiality to the issues in the case. In doing so, the convening authority appeared to engage in a partisan effort to protect and promote the interests of the victim that detracted from the impartiality of the IO. The military judge's remedy of dismissal without prejudice resulted in a new convening authority ordering the second Article 32 hearing and a new officer conducting the hearing without the

---

[6] Under the law of the case doctrine, this court will not review the lower court's ruling unless "the lower court's decision is 'clearly erroneous and would work a manifest injustice' if the parties were bound by it." *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002) (quoting *United States v. Williams*, 41 M.J. 134, 135 n.2 (C.M.A. 1994)).

troublesome restrictions. Any taint that attached to the original convening authority, IO, and March 2014 pretrial investigation did not carry over into the March 2015 preliminary hearing.

There are three reasons why we are not persuaded by Appellant's claim he "was forever denied the opportunity to cross-examine his accuser on matters pursuant to Mil. R. Evid, 412" at a pretrial hearing and thus entitled to the remedy of dismissal with prejudice. First, Appellant was never *entitled* to this opportunity prior to trial. Second, applying the "new" procedures of the preliminary hearing in Appellant's case did not violate the Ex Post Facto Clause. *See United States v. Henry*, 76 M.J. 595 (A.F. Ct. Crim. App. 2017). Finally, the question of whether Appellant could offer matters covered by Mil. R. Evid. 412 and cross-examine MB on the same was repeatedly and fully litigated at trial. We are convinced beyond a reasonable doubt that "an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness" of Appellant's court-martial because of the original convening authority's restrictions on the IO for the first Article 32 hearing.

## B. Mil. R. Evid. 412(b)(1)(C)

The narrow issue presented on appeal is whether Appellant was denied his rights under the "constitutionally required" exception in Mil. R. Evid. 412(b)(1)(C) when the military judge prevented Appellant from presenting a theory that a "pregnancy scare" made it more likely that MB would have fabricated the allegations of sexual abuse against Appellant.

The information that MB was at one point concerned that she might be pregnant consisted of text messages exchanged by MB with a friend. To be concerned, she would have necessarily engaged in "other sexual behavior" and thus this evidence was presumptively inadmissible unless an exception applied. A defense advanced by Appellant at trial was that MB completely fabricated the sexual abuse allegations in order to continue her relationship with AB. Appellant and his family, including MB, were due to move to Kadena Air Base, Japan, in the summer of 2013. The expected move presented an obvious impediment to MB continuing her relationship with AB. Further, her parents disapproved of AB. Appellant essentially argued that the pregnancy scare underscored the depth of MB's attachment to AB and desire to stay with him despite her parents' disapproval. In the anxiety of the moment, MB resorted to making false allegations to ensure that she would not be separated from AB. Appellant argued that MB's fear of pregnancy existed at the time of and after the driveway confrontation when AB told Appellant that MB and AB could tell the police "how much [Appellant] touch[ed] [his] daughter." It is undisputed that days later the pregnancy scare subsided and MB was not pregnant.

7

The military judge, noting that MB may have believed she was pregnant by AB when she initially made allegations against Appellant, concluded nonetheless that the pregnancy scare was not relevant or material to the allegations against Appellant: "[t]he Defense failed to show how [MB's] concern over a potential pregnancy provided [MB] with a motive to fabricate the allegations in this case." Thus, the military judge did not permit Appellant to elicit testimony concerning a pregnancy scare or other sexual behavior. The military judge did otherwise permit Appellant's counsel to fully explore the genesis and intensity of MB's relationship with AB.

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erickson*, 76 M.J. 231, 234 (C.A.A.F. 2017). "A military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *Id.* (quoting *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)) (internal quotation marks and citation omitted); *see also United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011) (citation omitted) ("Findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo."). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000). The application of Mil. R. Evid. 412 to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010).

Mil. R. Evid. 412 provides that evidence offered by the accused to show that the alleged victim engaged in other sexual behavior is generally inadmissible, with three limited exceptions. The third exception provides that the evidence is admissible if its exclusion "would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C). This exception includes an accused's Sixth Amendment right to confront witnesses against him, including the right to cross-examine and impeach those witnesses. *Ellerbrock*, 70 M.J. at 318. The burden is on the defense to overcome Mil. R. Evid. 412's general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998).

Generally, evidence of other sexual behavior by an alleged victim is constitutionally required and "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *Ellerbrock*, 70 M.J. at 318 (citation omitted); *see also Roberts*, 69 M.J. at 27. Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Materiality "is a multi-factored test looking at the

importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue." *Ellerbrock*, 70 M.J. at 318 (citations and internal quotation marks omitted) (alteration in original). The dangers of unfair prejudice to be considered "include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

While another military judge may have found the pregnancy scare at least marginally relevant to the Defense's proffered theory of a motive to fabricate, its probative value is difficult to discern. Indeed, Appellant's trial defense counsel acknowledged the difficulty in articulating the relevance and materiality for the military judge. It is not reasonable to presume that because of a fear that MB *might* be pregnant by AB, MB would make a false allegation of sexual abuse against Appellant. Even more confounding is that AB, not MB, actually made the first allegation that set Appellant's case into motion. To be sure, Appellant has not argued that the pregnancy scare *itself* provided a motive to fabricate; Appellant proffers it as a reason for MB to seek to preserve her relationship with AB, which was MB's overarching motive to fabricate the allegations according to Appellant.

While a limitation on an accused's presentation of evidence related to an issue such as a witness' motive to fabricate may interfere with an accused's right to confront the witness, "trial judges retain wide latitude [. . .] to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice . . . or interrogation that is . . . only marginally relevant." *United States v. Gaddis,* 70 M.J. 248, 253 (C.A.A.F. 2011) (quoting *Van Arsdall*, 475 U.S. at 679). In determining whether the exclusion of evidence of the pregnancy scare deprived Appellant of a fair trial or an *opportunity* for cross-examination, we ask whether "[a] reasonable jury might have received a significantly different impression of [MB]'s credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680.

Here, the military judge, by permitting a full examination of MB's relationship with AB except for any sexual aspects, simply imposed "reasonable limits" on the cross-examination, *see id.* at 679, and left open an "*opportunity* for effective cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Further, "once the defendant has been allowed to expose a witness's motivation in testifying, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *United States v. James*, 61 M.J. 132, 136 (C.A.A.F. 2005). The military judge permitted

Appellant to present evidence of MB's motive to fabricate. Moreover, a reasonable panel would not have received "a significantly different impression" of MB's credibility had Appellant been permitted to cross-examine her regarding the pregnancy scare.[7] Therefore, the contested evidence was not constitutionally required, does not qualify for the Mil. R. Evid. 412(b)(1)(C) exception, and was properly excluded under Mil. R. Evid. 412.

## C. Sixth Amendment Rights

In the aftermath of the abuse allegations being reported to the authorities, KA felt confused and uninformed about the actual substance of the allegations and the Guamanian criminal process. Desperate for information that neither her daughter nor the Guamanian federal authorities would provide, KA contacted the defense paralegal (DP) assigned to the Area Defense Counsel's (ADC) Office at Andersen Air Force Base. KA knew the DP from a fitness class they both attended. The DP confirmed to KA that Appellant had visited the ADC Office and had an attorney-client relationship with the ADC. The DP opined to KA that "it doesn't look good when someone comes in here all the time" and that the allegations against her husband were "legit." According to KA, the DP also told her that Appellant had been given instructions on erasing his computer hard drive.

About a month after the DP's conversation with KA, for reasons unrelated to this case, the DP was reassigned to the base legal office that would prosecute this case. The former DP was primarily assigned non-military justice duties but was tasked to review some of the more than 300 hours of recorded phone conversations of Appellant while he was confined. The former DP made multiple adverse comments about Appellant to various trial counsel and paralegals assigned to the case. The former DP offered that Appellant was "into some sick s**t," that he was "the type of person who would have erased his hard drive," and that Appellant's "computer needed to be seized." The former DP also referred to Appellant as a "sick guy" and "creepy," asserted there were things that trial counsel and paralegals did not know about the case, and said that "the misconduct he was being prosecuted for only scratched the surface." The former DP stated to her fellow paralegals that "I know I am not supposed to

---

[7] For both of the sexual abuse specifications of which Appellant was convicted, MB's testimony was corroborated by other evidence that would tend to positively impact a reasonable jury's impression of MB's credibility as to those claims. MB's testimony regarding the touching of her breast on divers occasions was corroborated by a prior consistent statement made to a teacher (*see* Paragraph E below). MB's testimony about Appellant touching her genitalia and breast with his hand and mouth while she was pretending to be asleep in her bed was corroborated by a semen stain found on MB's blanket consistent with Appellant's DNA.

tell you guys this, but he actually did it" and that she was "glad" she was not part of Appellant's defense team.

In an interview of KA leading up to Appellant's second trial, a trial counsel learned of the conversation the former DP had with KA regarding Appellant and erasing hard drives. The trial counsel advised the staff judge advocate (SJA) of the former DP's conversation with KA. Subsequently, a formal professional responsibility inquiry established the extent to which the former DP had made statements adverse to Appellant's legal interests and to whom she made those statements, including trial counsel. As a result, a new Government trial team was detailed and a different SJA advised the convening authority. Appellant's computer was never seized or searched for contraband.

In light of the former DP's statements and actions and the failure of others to report the former DP earlier, Appellant asserts his case should be dismissed for outrageous Government misconduct and interference with his Sixth Amendment right to counsel. Specifically, Appellant claims "this court should conclude the more than two-year invasion of the attorney-client relationship by the Government is a per se violation of the Sixth Amendment and dismiss this case." In other words, Appellant argues that the former DP's actions and their impact amount to structural error, or an error so serious that no proof of prejudice is required. Appellant separately asserts that the outrageous Government misconduct coupled with the apparent UCI (discussed above) denied him his Sixth Amendment right to a speedy trial. We disagree with both claims.

**1. Sixth Amendment Right to Counsel**

Appellant raised this issue of "outrageous government conduct" at trial styled as a motion to dismiss for UCI and "breach of the attorney-client privilege." In ruling on the motion, the military judge made detailed findings of fact that we now adopt as our own.

The Government argues as a threshold matter that at the time of the former DP's disclosures to KA, Appellant's Sixth Amendment right to counsel had not attached and the later disclosures to legal office personnel occurred when the former DP was no longer part of Appellant's defense team for Sixth Amendment purposes. Therefore, the Government argues that any error stemming from these disclosures could not have been constitutional error and that prosecutorial misconduct is the appropriate framework to analyze error and determine whether there is any prejudice attributable to the former DP's disclosures.

The Sixth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. The Supreme Court has interpreted this to mean "that the

right to counsel does not attach until the initiation of adversary judicial proceedings. . ." *United States v. Gouveia,* 467 U.S. 180, 188 (1984). Adversary judicial proceedings commence for an accused "at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 398 (1977) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689 (1972)). In the military, preferral of charges initiates adversary judicial proceedings and causes the Sixth Amendment right to counsel to attach. *United States v. Wattenbarger,* 21 M.J. 41, 43 (C.M.A. 1985). While the Government makes a well-reasoned argument why Appellant's Sixth Amendment right to counsel had yet to attach or was not attached at the time of the former DP's disclosures, we need not resolve this question. Assuming without deciding that Appellant's Sixth Amendment right to counsel did attach, we find the disclosures do not constitute structural error and did not prejudice Appellant.

When a Sixth Amendment claim involves a governmental act or omission affecting the right of an accused to the assistance of counsel, we consider whether the infringement involves a structural error—an error so serious that no proof of prejudice is required—or whether the error must be tested for prejudice. *United States v. Brooks*, 66 M.J. 221, 223–24 (C.A.A.F. 2008). Structural error exists "when a court is faced with 'the difficulty of assessing the effect of the error'" or the error is so fundamental that "harmlessness is irrelevant." *Id.* at 224 (citations omitted).

As the United States Court of Appeals for the Armed Forces noted in *Brooks*, "'Structural errors involve errors in the trial mechanism' so serious that 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Id.* at 224 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991)). "[T]here is a strong presumption that an error is not structural." *Id.* (citations and quotation marks omitted).

As the military judge concluded, the Government did not seize or search Appellant's computer as was urged by the former DP. A review was conducted of Appellant's cell phone, but this did not result in new evidence pertinent to the charges. Appellant speculates that the former DP's influence on KA caused KA to cooperate with the Air Force in the prosecution of Appellant. KA, however, clearly stated it was the trust she had in Air Force officials, in stark contrast to her negative experience with Guamanian officials, which was the determinative factor for her and MB to cooperate in the Air Force prosecution of Appellant. Finally, the trial team and SJA who were aware of the statements of the former DP were disqualified from the case. Under these circumstances, the effect of the rogue actions of the former DP could be assessed and the error resulting from those actions was not so fundamental that harmlessness is irrelevant. Thus, we conclude no structural error.

We next turn to the analysis of whether the actions of the former DP prejudiced Appellant. In that posture, "we shall assume, without deciding, that the Sixth Amendment was violated in the circumstances of this case." *United States v. Morrison,* 449 U.S. 361, 364, (1981). Assuming that the error is of a constitutional dimension, we assess whether it was harmless beyond a reasonable doubt. *See United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). An error is harmless beyond a reasonable doubt when the error did not contribute to an appellant's conviction or sentence. *United States v. Hills*, 75 M.J. 350, 357 (C.A.A.F. 2016). An error is not harmless beyond a reasonable doubt when there is a reasonable possibility that the error might have contributed to the conviction. *Id.* There is no nexus between the disclosures of the former DP and the charges referred against Appellant or any of the evidence offered against him. As deeply troubling as the actions of the former DP are, we are confident they did not contribute to the verdict in Appellant's case and thus convinced beyond a reasonable doubt of the harmlessness of the error.

### 2. Sixth Amendment Right to Speedy Trial

Separate and apart from the alleged impact of the former DP's actions on the outcome of his case, Appellant claims the Government violated his Sixth Amendment right to a speedy trial. Appellant argues that the former DP's actions coupled with the apparent UCI committed by the original convening authority resulted in delays attributable to the Government and are the primary reasons it took 899 days to get his case from the original date of preferral to trial on the merits despite his demands for a speedy trial. Appellant asserts he was prejudiced by the delay because of MB and AB's claims that their memories faded with the passage of time to explain inconsistencies in their accounts. We find no violation of Appellant's Sixth Amendment right to a speedy trial.

We review de novo Sixth Amendment speedy trial issues. *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003). In analyzing an appellant's speedy trial right, we "giv[e] substantial deference to the military judge's findings of fact unless they are clearly erroneous." *United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010). In determining whether an appellant has been denied his right to a speedy trial under the Sixth Amendment and following Supreme Court precedent, this court considers the following factors: (1) the length of the delay; (2) the reason for the delay, (3) whether the appellant asserted his right to a speedy trial; and (4) prejudice to the appellant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). None of the four factors identified above is regarded "as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Id.* at 533. Instead, they are "related factors and must be considered together with such other circumstances as may be relevant. In sum, these

factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.*

### a. Length of the Delay

Charges were originally preferred on 3 February 2014. As a remedy for the apparent UCI, the military judge dismissed the original charges without prejudice on 31 July 2014. Months later, on 18 November 2014, charges were preferred anew against Appellant. After the Article 32, UCMJ, preliminary hearing, referral, and the setting of multiple trial dates followed by continuances, this case finally made it to trial on 21 July 2016—899 days after the original charges were preferred and 611 days after the second preferral. Because the original charges in this case were completely dismissed and then later preferred anew, we first must resolve the trigger date for the Sixth Amendment speedy trial analysis.

In *United States v. Amerine*, 17 M.J. 947 (A.F.C.M.R. 1984), this court, citing to *United States v. MacDonald*, 456 U.S. 1 (1982), held that "[w]here the Government withdraws charges in good faith, the speedy trial provision of the Sixth Amendment is inapplicable to the period between the withdrawal of the charges and a subsequent repreferral of those charges." *Amerine*, 17 M.J. at 950. In *MacDonald*, the Supreme Court held that "[o]nce charges are dismissed, the speedy trial guarantee is no longer applicable" and "[a]ny undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." *Id.* at 7–8.

In this case, it was the military judge, not the Government, who dismissed without prejudice the original charges as a remedy for apparent UCI. We find that the Government re-preferred the charges in good faith and the speedy trial provision of the Sixth Amendment is inapplicable to the period between the dismissal and subsequent re-preferral. Thus, 18 November 2014 is the trigger date for our speedy trial analysis, and 611 days is the period of the delay. The length of the delay is sufficient to trigger a full *Barker* analysis.

### b. Reasons for the Delay

Appellant asserts that "much of the delay in this case is attributable to outrageous government misconduct." To support his claim, Appellant argues it was unreasonable that 110 days passed after the dismissal of charges and before their re-preferral. This period however, as discussed above, is not subject to Sixth Amendment speedy trial scrutiny and therefore we do not give it any weight in the *Barker* analysis. Appellant also urges that this second *Barker* factor weighs in his favor because the Government requested a continuance in

order to replace its trial team,[8] which resulted in a delay from 14 March 2016 until 21 July 2016. The Government points to 658 days of defense unavailability in order to explain the bulk of the delay.[9] It is also notable that travel difficulties for the military judge provided the impetus for a continuance of the trial from September 2015 to 18 January 2016.

In *Vermont v. Brillion*, 556 U.S. 81 (2009), the United States Supreme Court provided guidance in weighing reasons for delay in applying *Barker*.

> *Barker* instructs that "different weights should be assigned to different reasons," and in applying *Barker*, we have asked "whether the government or the criminal defendant is more to blame for th[e] delay." Deliberate delay "to hamper the defense" weighs heavily against the prosecution. "[M]ore neutral reason[s] such as negligence or overcrowded courts" weigh less heavily "but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."
>
> In contrast, delay caused by the defense weighs against the defendant: "[I]f delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine."

*Id.* at 90 (alterations in original) (internal citations omitted).

While this case does not present a model of celerity, we do not divine an effort on the part of the Government to delay in order to harm Appellant's defense. On the contrary, the Government consistently sought to get the case to trial consistent with the availability of Appellant's defense team, an expert witness, and a military judge. Once the full impact of the actions of the former DP was understood, the Government replaced the trial team to ensure the prosecution of Appellant was not tainted and sought a continuance consistent with the availability of a new trial team. Having weighed all the reasons for the delays in this case, we find that neither the Government nor Appellant sought to delay the case for tactical advantage, but because of the length of the

---

[8] The original trial team was replaced due to their knowledge of the statements made about Appellant by the former DP.

[9] The Government addressed the entire 899 day period from the first preferral until the verdict. Appellant asserted unavailability for the following dates: 17–19 March 2014 and 22 April to 28 July 2014, which were prior to the dismissal of the original charges; 18 November 2014 to 2 February 2015; 10–25 February 2015; 4–6 March 2015; 24 March to 20 September 2015; 29 September 2015 to 17 January 2016; 25 January to 14 March 2016; and 25 March to 21 July 2016.

delay and the fact that ultimate responsibility for delay not attributable to Appellant rests with the Government, this factor tilts slightly in favor of Appellant.

### c. Assertion of the Speedy Trial Right

Appellant requested speedy trial on multiple occasions; however, he also retained civilian counsel who was unavailable for significant periods of time. The assertion of his right to a speedy trial weighs slightly in favor of Appellant.

### d. Prejudice

Appellant asserts he was prejudiced by the delay in trying his case because MB and AB were able to claim their memories faded with the passage of time to explain inconsistencies in their accounts.

Prejudice is assessed "in the light of the interests of defendants which the speedy trial right was designed to protect." The Supreme Court has identified three such interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

Appellant does not now argue the delay impacted his ability to prepare a defense but contends only the delay provided a convenient excuse for adverse witnesses to claim not to remember certain events or prior statements when being impeached. We find that Appellant's defense was not impaired. In each instance the substantive evidence that Appellant sought to present through the testimony of MB and AB was eventually admitted and argued by Appellant's counsel in closing argument. The lapses of memory by MB and AB were not significant to the outcome of the case; Appellant was able to present his defense.

We are also mindful of what the United States Supreme Court stated ten years after *Barker* in *MacDonald* regarding the type of prejudice the Sixth Amendment was intended prevent:

> The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*MacDonald*, 456 U.S. at 8. During the period of delay we considered, Appellant does not claim he was subject to pretrial confinement or a restriction on liberty. Because we find no oppressive pretrial incarceration or impairment to Appellant's defense, we find no Sixth Amendment prejudice to Appellant by the delay.

Having carefully applied and balanced the *Barker* factors in the circumstances of this case, we find no violation of Appellant's Sixth Amendment right to speedy trial.

### D. Mil. R. Evid. 513 and In Camera Review

At trial, Appellant sought an in camera review of MB's mental health records arguing that any communications made by MB to a mental health provider regarding child abuse or neglect were not privileged under Mil. R. Evid. 513, the psychotherapist-patient privilege. On appeal, Appellant asserts that the military judge abused his discretion when he declined to conduct the in camera review and requests that we order production of MB's mental health records for in camera review or, in the alternative, set aside the findings and sentence and authorize a rehearing. We decline to do so.

We review a trial judge's conclusion that an appellant failed to provide a sufficient basis for an in camera review for an abuse of discretion. *United States v. Chisum*, 75 M.J. 943, 946 (A.F. Ct. Crim. App. 2016), *aff'd*, 77 M.J. 176 (C.A.A.F. 2018). The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *McElhaney*, 54 M.J. at 130. Prior to conducting an in camera review of the records or communications of a patient, the military judge must find by a preponderance of the evidence that the moving party showed the following: (A) a specific factual basis demonstrating a reasonable likelihood that the records or communications would yield evidence admissible under an exception to the privilege; (B) that the requested information meets one of the enumerated exceptions under subsection (d) of this rule; (C) that the information sought is not merely cumulative of other information available; and (D) that the party made reasonable efforts to obtain the same or substantially similar information through non-privileged sources. Mil. R. Evid. 513(e)(3).

In ruling on Appellant's request for an in camera review of MB's mental health records, the military judge applied Mil. R. Evid. 513 and found that Appellant failed to show by a preponderance of the evidence a "specific factual basis demonstrating a reasonable likelihood that the records or communications would yield evidence admissible under an exception to the privilege" and "that the requested information meets one of the enumerated exceptions under subsection (d) of this rule." The military judge found that "simply because the

alleged victim made allegations and shortly thereafter went to counseling, it does not automatically follow that she discussed the sexual assault allegations in counseling." He further found that the evidence presented on this issue "demonstrated exactly the opposite." KA testified in the motions hearing that MB's therapist told KA that MB discussed MB's day-to-day activities rather than the sexual abuse. MB had stated in the first Article 32 hearing that she did not discuss the sexual abuse with her therapist. The military judge's conclusion that Appellant failed to make the required showing under Mil. R. Evid. 513(e)(3)(A) was not arbitrary, fanciful, clearly unreasonable, or clearly erroneous.

### E. Mil. R. Evid 801(d)(1)(B), Prior Consistent Statement

After MB testified and was extensively cross-examined about the sexual abuse, to include Appellant touching MB's breast with his hand, the Government sought to elicit the testimony of Mrs. KF, a teacher at MB's high school, to relay a prior statement of MB. MB had confided in Mrs. KF about a "friend" who was experiencing abuse at the hands of her stepfather. Over the objection of Appellant, the military judge admitted MB's statement to Mrs. KF under Mil. R. Evid 801(d)(1)(B) as a prior consistent statement to rebut an allegation of recent fabrication. Based on "the clear position and theory that the defense has taken and explored thoroughly with [MB] respecting the recent fabrication," the military judge concluded the prior statement qualified for admission. Appellant asserts on appeal that the military judge abused her discretion. We disagree.

"A military judge's decision to admit or exclude evidence is reviewed for abuse of discretion." *United States v. Allison*, 49 M.J. 54, 57 (C.A.A.F. 1998). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *McElhaney*, 54 M.J. at 130. A prior consistent statement is not hearsay if it is "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Mil. R. Evid. 801(d)(1)(B). Our superior court has consistently interpreted the rule to require that a prior statement, admitted as substantive evidence, precede any motive to fabricate or improper influence that it is offered to rebut. *Allison*, 49 M.J. at 57. In sum, a "statement is not hearsay if . . . [1] the declarant testifies at the trial or hearing and [2] is subject to cross-examination concerning the statement, and [3] the statement is . . . consistent with the declarant's testimony [4] and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . ." *United States v. McCaskey*, 30 M.J. 188, 188 (C.M.A. 1990).

Mrs. KF testified about a conversation she had with MB about six months prior to the allegations and well before MB met AB. MB told Mrs. KF she had

a friend who had a problem with her stepfather. MB relayed that her friend's mother asked her friend to take off her shirt so that her stepfather could "massage" her. "[T]he mother felt that the—that the stepfather you know, that they—there was kind of—I guess a, not a bond between them and that it would allow a stronger bond between the stepfather and the—and the so-called friend at the time." The mother "told her to take off her top and that that would make the bonding better between her and her stepfather." Echoing the testimony of Mrs. KF about MB's "friend," Appellant himself testified that there were occasions when he would massage MB's bare skin in part at the behest of KA who wanted there to be a stronger bond between Appellant and MB.

That MB's prior statement preceded the motive to fabricate is not reasonably in dispute. MB made the statement to Mrs. KF before MB met AB. At the time MB told Mrs. KF about her "friend," MB could not have had a motive to fabricate rooted in a desire to preserve her relationship with AB.

Appellant's primary argument against admission of MB's prior statement is that the statement was not consistent with MB's testimony at trial. Appellant specifically points to the inconsistency between MB's statement about a "friend" being massaged by the friend's stepfather and MB's testimony about being massaged by Appellant. Contrary to Appellant's characterization, there is considerable consistency between MB's description of what happened to the "friend" at the hands of the friend's stepfather and MB's description of what Appellant, her stepfather, did to her. Even the encouragement of the friend's mother mirrors the role KA played in Appellant's massages of MB. Given the substantial similarities between the circumstances of the massages and the reasonable conclusion that MB was in fact describing Appellant's abuse when talking to Mrs. KF about a "friend," we find the military judge did not abuse her discretion in concluding that the prior statement to Mrs. KF was consistent with MB's in-court testimony and admitting it.

### F. Improper Argument

Appellant asserts that, during closing argument, trial counsel made an impermissible comment that Appellant sought the assistance of counsel, that the comment amounted to constitutional error, and that the error was not harmless beyond a reasonable doubt. We disagree. In context, trial counsel's comment was a fair reply to matters testified to by Appellant in response to a member's question.

At trial, the prosecution called a digital forensics expert who examined Appellant's cell phone and found "there were over 400 text messages, all of which were deleted." Specifically, the expert testified that it appeared "these messages were intentionally deleted by the user." Appellant, who testified during the findings portion of trial, received the following question from a member:

"Why are the phone messages with [your wife] and [your daughter] deleted from your phone?" Appellant responded,

> Sir, when all this was starting, while [my daughter] was talking to the chaplains, [my wife] and I were trying to figure out what the situation was, *I went and talked with ADC. They had told me that if this goes into investigative mode what was going to happen.* So kind of a series of events around. So seeing how sometimes the system's stacked on the wrong end, I wanted them to go to DoCoMo[10] and get the source on everybody's information. I didn't want them just to take my phone as a perk and only use that. Like, there is more to this story than what's just on my phone. So I knew that data was there. I could get it myself every month when I go pay my bill. And in hindsight, I should have.

(Emphasis added) (Footnote inserted).

In light of Appellant's explanation for the deletion of the text messages, trial counsel conducted additional cross-examination.

> Q. You were made aware now by an attorney, who's telling you that this [investigation] is what's coming?
>
> A. Yes.
>
> Q. Which confirms everything ----
>
> A. Possibly.
>
> Q. ---- that you thought potentially before, correct?
>
> A. Yes, sir.
>
> Q. And you deleted those messages before OSI could get your phone, isn't that true?
>
> A. Yes, sir.
>
> …
>
> Q. Because you were trying to hid[e] that information, weren't you?
>
> A. No, sir.
>
> Q. You weren't trying to hide that information?

---

[10] Although "DoCoMo" is not further described or explained in the record, in the context used we conclude that "DoCoMo" refers to a telecommunications service provider used by Appellant, KA, and MB.

A. No, sir.

Q. You would agree with me though, it seems fairly odd that somebody who's not trying to hide something is deleting messages off their phone?

A. I can see how that could look.

During closing argument, Appellant's counsel sought to defuse the impact of the deletion of the text messages and the reasonable inference of consciousness of guilt.

> So, why does he do that? If he's of a guilty mind, why not continue it . . . He deletes those messages, why? Because he looked really stupid. And if someone tries to take them out of context, exactly as they do, he knows what they'll say. They'll pound on a podium and say, "These messages…" taken out of context with the scenario, without you knowing, or him being able to prove that he's being extorted. He knows. So, when he testifies and he says he wants the full context to be out there, that's exactly now what you have, is the full context. Thankfully. Okay, that makes sense.

In rebuttal argument, trial counsel addressed Appellant's proffered reason for deleting the messages, first summarizing Appellant's argument why he deleted the text messages.

> Don't want that. We don't want that coming out. I'm an innocent person. We don't want any of that. We don't want anybody to think that I'm innocent and doing all of these things, because I'm an innocent person and I have absolutely nothing to hide.

Trial counsel then sought to make the point that Appellant's explanation was not credible and deleting the text messages was evidence of consciousness of guilt.

> It's garbage. It's garbage, because he's going to see an attorney, an area defense counsel. He's given advice and he leaves that office and deletes messages on his phone that could contain incriminating information, members. That's not what an innocent person would do.

Trial defense counsel objected and the following discussion ensued:

> CDC [Civilian Defense Counsel]: I'm going to object just to make sure that it's not an insinuation that an innocent person wouldn't go talk to an area defense counsel. That's -- I'm sure

> that's not what [trial counsel] was saying, I'm just making sure the objection is made.
>
> TC [Trial Counsel]: That's absolutely not what [trial counsel] was saying, ma'am.
>
> MJ [Military Judge]: And that objection would be sustained if it was on that basis. I did not hear it that way, but members, to the extent that it sounds like he couldn't go see the area defense counsel, whether it being innocent or guilty in his own mind. That, that's -- that wouldn't be acceptable argument, so please don't read it that way.

Trial counsel then continued the rebuttal argument, emphasizing that Appellant knew that MB's allegations would result in an investigation and acknowledging the Government's burden "to prove beyond a reasonable doubt that [Appellant] had reason to believe there were or would be criminal proceedings against himself or that some law enforcement official of the military would be investigating [his] actions."

"Whether there has been improper reference to an accused's invocation of his constitutional rights is a question of law that [military courts] review de novo." *United States v. Moran*, 65 M.J. 178, 181 (C.A.A.F. 2007) (citation omitted). "The law generally discourages trial counsel's presentation of testimony or argument mentioning an accused's invocation of his constitutional rights unless, for example, an accused invites such testimony or argument in rebuttal to his own case." *Moran*, 65 M.J. at 181 (citing *United States v. Robinson*, 485 U.S. 25, 32 (1988)). "Under the 'invited response' or 'invited reply' doctrine, the prosecution is not prohibited from offering a comment that provides a fair response to claims made by the defense." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005). When "[t]he government d[oes] not inject [the] Appellant's invocation of his right into evidence" but rather "the matter was brought out by [defense] to support the defense theory of the case," the prosecution can argue against that theory. *United States v. Haney*, 64 M.J. 101, 106 (C.A.A.F. 2006). Accordingly, "trial counsel 'may strike hard blows, [but] he is not at liberty to strike foul ones.'" *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)) (alterations in original). "In order to determine whether or not comments are fair, 'prosecutorial comment must be examined in context.'" *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001) (quoting *Robinson*, 485 U.S. at 32).

We start our analysis by noting that Appellant himself, in response to a question from a court member why Appellant deleted messages from his phone, put his visit to the ADC before the factfinder. He employed his invocation of counsel as a contextual detail in an effort to give an innocent explanation why

he deleted the messages: to ensure that law enforcement would be compelled to obtain the complete text messages of MB, KA, and Appellant in the investigation he knew would transpire. To this end, Appellant referenced his consultation with counsel to lend credibility to his attempt to exculpate himself. Appellant's sworn testimony, followed by his counsel's closing argument on the matter, invited trial counsel's reply.

While trial counsel could have avoided any mention of Appellant's interaction with his counsel, it is clear that trial counsel did not assert Appellant seeking counsel was proof of guilt. Rather, the substance of trial counsel's argument was that only a guilty person, knowing an investigation is underway, finds it necessary to destroy incriminating evidence, which Appellant did after seeking counsel. This was a fair response to Appellant's explanation for deleting the messages on his phone and this response did not amount to an impermissible comment by trial counsel.

Assuming arguendo the comment was error, the error was harmless beyond a reasonable doubt. Appellant's counsel objected to "make sure" that trial counsel was not insinuating "that an innocent person wouldn't go talk to an area defense counsel." The military judge agreed there was no improper insinuation but *sua sponte* provided as a precaution a curative instruction to the members. Based on the context of the trial counsel's comment during rebuttal argument, how it was understood by both Appellant's counsel and the military judge, and the curative instruction, we are confident there is no reasonable possibility the comment contributed to the verdict in Appellant's case. *See Hills*, 75 M.J. at 357.

## G. Ineffective Assistance of Counsel

Relying on a finding of the inquiry officer who reviewed the actions of the former DP as a professional responsibility (PR) matter, Appellant asserts ineffective assistance of counsel. Specifically, Appellant points to the PR inquiry finding that the former DP "unlawfully" instructed Appellant to destroy evidence by erasing his hard drive. According to Appellant, that instance of ineffective assistance of counsel resulted in prejudice when the trial counsel argued that the destruction of evidence is not something "an innocent person would do." We reiterate how deeply troubling we find the actions of the former DP, but we do not agree that Appellant suffered prejudice as a result of ineffective assistance of counsel.

The Sixth Amendment guarantees Appellant the right to effective assistance of counsel. U.S. CONST. amend. VI; *Gilley*, 56 M.J. at 124. In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984): "To prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's

performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361–62 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687). In reviewing for ineffectiveness, the court "looks at the questions of deficient performance and prejudice de novo." *United States v. Gutierrez*, 66 M.J. 329, 330–31 (C.A.A.F. 2008). We review allegations of ineffective assistance utilizing the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

Assuming without deciding that the former DP's instruction to Appellant to erase his hard drive constituted deficient performance of "counsel" for Sixth Amendment purposes,[11] we consider whether there was a reasonable probability of a different result absent the error and determine there was not. Plainly stated, Appellant has not shown the connection between the deficient performance, trial counsel's argument, and the result in his trial. The former DP instructed Appellant to erase his computer hard drive and made repeated comments to trial legal office personnel regarding Appellant and a search and seizure of his computer.

By contrast, trial counsel's argument about destroying evidence concerned text messages Appellant deleted from his cell phone. There is no indication the former DP ever discussed with Appellant destroying evidence other than erasing his computer hard drive. When asked by the court member why Appellant deleted the text messages on his cell phone, Appellant did not attribute his decision to the former DP, ADC, or any member of his defense team. As detailed above, Appellant testified that once he was advised there would be an investigation, *he* decided to delete the text messages from his cell phone to ensure that law enforcement would obtain all the text messages to include not only his but also messages from MB and KA. Trial counsel's argument—that

---

[11] It is not necessary to decide the issue of deficient performance when it is apparent that the alleged deficiency has not caused prejudice. *See Loving v. United States*, 68 M.J. 1, 2 (C.A.A.F. 2009).

"destruction of evidence is not something an innocent person would do"—rebutted Appellant's explanation and had nothing to do with the former DP's instruction about the hard drive.

Finally, there was no connection between the former DP's deficient performance and Appellant's conviction. As discussed above, Appellant's computer was never seized, no charge against Appellant concerned his computer, and no evidence from Appellant's computer hard drive was used against Appellant. Accordingly, we find Appellant has failed to show a reasonable probability that, absent the error of the ineffective assistance, there would have been a different result in Appellant's trial.

## H. Timely Appellate Review

Appellant, averring that "a failure to adequately staff the Appellate Defense Division all but guarantees that [his] case will not be resolved within the eighteen-month timeline established by" *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), argues this court should order appropriate relief. We decline to do so.

We review de novo "[w]hether an appellant has been denied [his] due process right to a speedy post-trial review . . . and whether [any] constitutional error is harmless beyond a reasonable doubt." *Allison*, 63 M.J. at 370. A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed before this court. *Moreno*, 63 M.J. at 142. The *Moreno* standards continue to apply as a case remains in the appellate process. *United States v. Mackie*, 72 M.J. 135, 135–36 (C.A.A.F. 2013). When a case is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors elucidated in *Barker* and *Moreno*. *See United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011). Those factors are: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135; *United States v. Mizgala*, 61 M.J. 122, 129 (C.A.A.F. 2005); *see also Barker*, 407 U.S. at 530.

This case was originally docketed with the court on 21 December 2016. The delay in rendering our decision within 18 months is facially unreasonable. However, we analyzed the *Barker* factors and find no due process violation resulted from the appellate delay.

While our decision in the case is rendered outside of 18 months, it is only beyond that date by a single week.

The reasons for the delay include the fact that Appellant's brief was not filed until 1 February 2018, over 13 months after the case was docketed with

this court. The Government's answer was filed on 5 March 2018. This court issued its opinion within four months of the Government's answer.

Appellant's counsel requested a total of seven enlargements of time, all of which were granted. In the motion for a second enlargement of time, Appellant's counsel noted that the Government ordered Appellant's detailed counsel to prepare for a pending deployment, and new counsel was detailed to replace deployed counsel on 10 July 2017. Appellant cited the replacement of counsel as good cause for the enlargement of time. On appeal, Appellant cites the deployment of his original counsel as evidence of the Government's failure to adequately staff the Appellate Defense Division. While Appellant may be correct in implying that his original counsel would have filed a brief on his behalf sooner than 1 February 2018, Appellant falls far short of convincing us that the replacement of his counsel at the six-month point caused an unreasonable delay in his case.

As demonstrated by the 11 assignments of error, Appellant's case is notable for its lengthy and complicated procedural history, even before the trial on the merits. The record of trial consists of 21 volumes. The trial transcript is 1,343 pages. There are 26 prosecution exhibits, 17 defense exhibits, and 56 appellate exhibits. It could be expected that this case would require more time than a less complicated, less voluminous one.

Appellant did not make a demand for speedy appellate review.

We find no prejudice to Appellant resulting from the delay for the court to complete appellate review of his case. When there is no prejudice resulting from the delay, "we will find a due process violation only when, in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). That is not the case here where the delay is not so egregious and tolerating it does not adversely affect the public's perception of the military justice system.

We have also considered whether Appellant is due relief because of the violation of the *Moreno* standards in this case in the absence of a due process violation. *United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002). This court set out a non-exhaustive list of factors we consider when evaluating the appropriateness of *Tardif* relief in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). Those factors include how long the delay exceeded appellate review standards, the reasons noted by the Government for the delay, whether the Government acted with bad faith or gross indifference, evidence of institutional neglect, harm to Appellant or the institution, the goals of justice and good order and discipline, and, finally, whether the court can provide any meaningful relief given the passage of time.

*Id.* No single factor is dispositive and we may consider other factors as appropriate. *Id.*

On the whole, we apply the *Gay* factors and find the delay, although presumptively unreasonable, to be justified. The length of the delay exceeded the *Moreno* standard of 18 months by only a week. We also find no evidence of bad faith or gross indifference on the part of the Government. For these reasons, we conclude no *Tardif* relief is warranted.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court